# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| ANTHONY BOOTH, Individually and on Behalf of All Other Persons Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>LINN ENERGY LLC, MARK E. ELLIS, KOLJA ROCKOV, and DAVID B. ROTTINO,<br><br>Defendants. | **Civil Action No.: 13-cv-1992**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Anthony Booth ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Linn Energy LLC ("Linn" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased Linn units between April 28, 2011 and July 1, 2013, both dates inclusive (the "Class Period"), seeking to recover damages caused by

defendants' violations of the federal securities laws and to pursue remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against the Company and certain of its top officials.

2.      Linn is an independent natural gas exploration and production company.   The Company develops and acquires various oil and gas properties in the United States.

3.      Through a series of articles, *Barron's* described the Company as "the country's most overpriced large energy producer" for using non Generally Accepted Accounting Principles ("GAAP") accounting to mask considerable weakness in its distributable cash flows, calling into question the sustainability of its dividend.     Further, *Barron's* questioned the Company's accounting for its derivative contracts by, for example, excluding the cost of its puts from its cash flow, while including the gains.

4.      As a result of these disclosures, Linn units declined $1.97 per unit or more than 5%, to close at $33.75 per unit on May 6, 2013, as well as an additional $0.55 per unit on June 17, 2013.

5.      On July 1, 2013, the Company disclosed that the SEC opened an informal inquiry in connection with the Company's use of non-GAAP financial measures, its hedging strategies, and its acquisition of Berry Petroleum Company jointly with its affiliate, LinnCo, LLC.

6.      On this news, Linn declined $10.50 per unit or 31.5% within two trading sessions, to close at $22.79 per unit on July 3, 2013.

7.      Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company engaged in improper accounting for its hedging

strategy, including the failure to properly treat certain hedging costs invested in derivatives as expenses; (2) the Company was overstating the cash flow available for distribution to unit holders by improperly using non-GAAP financial measures to account for certain derivatives including put options on natural gas; (3) the Company's energy production was not increasing, despite its heavy capital expenditures; and (4) as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's units, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

10.      This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

11.      Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b) as Linn's principal place of business is located within this District.

12.      In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

13.     Plaintiff as set forth in the attached certification purchased Linn units at artificially inflated prices during the Class Period and has been damaged thereby.

14.     Defendant Linn is a Delaware corporation, with its principal place of business located at 600 Travis, Suite 5100, Houston, TX 77002.  Linn's units trade on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "LINE."

15.     Defendant Mark E. Ellis ("Ellis") has served at all relevant times, as the Company's Chief Executive Officer, President and Chairman of its Board of Directors.

16.     Defendant Kolja Rockov ("Rockov") has served, at all relevant times, as the Company's Chief Financial Officer and Executive Vice President.

17.     Defendant David B. Rottino ("Rottino") has served, at all relevant times, as the Company's Chief Accounting Officer and Executive Vice President.

18.     The defendants referenced above in ¶¶ 15 - 17 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

19.     Linn is an independent oil and natural gas company that acquires, develops and maximizes cash flow from a portfolio of long-lige oil and natural gas assets.  The Company's properties are located in the United States, in the Mid-Continent, the Hugoton Basin, the Green River Basin, the Permian Basin, Michigan, Illinois, the Williston/Powder River Basin, California and east Texas.

**Materially False and Misleading**
**Statements Issued During the Class Period**

20.     On April 28, 2011, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2011.  For the quarter, the Company reported net loss of $447 million, or ($2.75) per unit, as compared to net income of $65 million, or $0.50 per unit for the same period a year ago.  As to non-GAAP financial measures, the Company reported adjusted net income of $62 million, or $0.38 per unit and adjusted earnings before interest, taxes, depreciation and amortization ("EBITDA") of $210 million, as compared to the adjusted net income of $47 million, or $0.36 per unit and adjusted EBITDA of $152 million for the same period a year ago.

21.     On April 28, 2011, the Company filed a quarterly report for the period ended March 31, 2011 on Form 10-Q with the SEC, which was signed by Defendant Rottino and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-Q contained signed certifications pursuant to Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Ellis and Rockov, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

22.     On July 28, 2011, the Company issued a press release announcing its financial results for the second quarter ended June 30, 2011.  For the quarter, the Company reported net income of $237 million, or $1.34 per unit, as compared to net income of $60 million, or $0.41 per unit for the same period a year ago.  As to non-GAAP financial measures, the Company reported adjusted net income of $83 million, or $0.47 per unit and adjusted EBITDA of $264 million, as compared to adjusted net income of $53 million, or $0.36 per unit and adjusted EBITDA of $175 million for the same period a year ago.

5

23.     On July 28, 2011, the Company filed a quarterly report for the period ended June 30, 2011 on Form 10-Q with the SEC, which was signed by Defendant Rottino and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Ellis and Rockov, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

24.     On October 27, 2011, the Company issued a press release announcing its financial results for the third quarter ended September 30, 2011.  For the quarter, the Company reported adjusted EBITDA of $243 million, and adjusted net income of $0.44 per unit.  The press release also stated in relevant part:

> LINN utilizes commodity hedging to capture cash-flow margin and reduce cash-flow volatility. The Company reported gains on derivatives from oil and natural gas hedges of approximately $824 million for the quarter. This includes approximately $732 million of noncash gains from the change in fair value of derivatives, due to a decrease in commodity prices, and realized hedge gains of approximately $92 million during the third quarter. The realized hedge gains include approximately $27 million of gains related to canceled derivatives. Noncash gains or losses do not affect adjusted EBITDA, cash flow from operations or the Company's ability to pay cash distributions.

> For the third quarter 2011, the Company reported net income of approximately $838 million, or $4.74 per unit, which includes a noncash gain of $732 million, or $4.15 per unit, from the change in fair value of derivatives covering future production, and a realized gain of $27 million, or $0.15 per unit, on the cancellation of derivatives. Excluding these items, adjusted net income (a non-GAAP financial measure) for the third quarter 2011 was approximately $79 million, or $0.44 per unit.

25.     On October 27, 2011, the Company filed a quarterly report for the period ended September 30, 2011 on Form 10-Q with the SEC, which was signed by Defendant Rottino and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Ellis

and Rockov, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

26.     On February 23, 2012, the Company issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2011. For the quarter, the Company reported net loss of $190 million, or ($1.09) per unit, as compared to net loss of $244 million, or ($1.64) per unit for the same period a year ago. As to non-GAAP financial measures, the Company reported adjusted net income of $89 million, or $0.51 per unit and adjusted EBITDA of $281 million, as compared to adjusted net income of $63 million, or $0.43 per unit and adjusted EBITDA of $221 million for the same period a year ago. For the year, the Company reported net income of $438 million, or $2.52 per unit, as compared to a net loss of $114 million, or ($0.80) per unit for the same period a year ago. As to non-GAAP financial measures, the Company reported adjusted net income of $313 million, or $1.80 per unit and adjusted EBITDA of $998 million, as compared to adjusted net income of $219 million, or $1.54 per unit and adjusted EBITDA of $732 million for the same period a year ago.

27.     On February 23, 2012, the Company filed an annual report for the period ended December 31, 2011 on Form 10-K with the SEC, which was signed by the Individual Defendants and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the Form 10-K contained signed certifications pursuant to SOX by Defendants Ellis and Rockov, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

28.     The Form 10-K represented the following in relevant part concerning the Company's business strategy:

**Grow Through Acquisition of Long-Life, High Quality Properties**

The Company's acquisition program targets oil and natural gas properties that it believes will be financially accretive and offer stable, long-life, high quality production with relatively predictable decline curves, as well as lower-risk development opportunities. The Company evaluates acquisitions based on decline profile, reserve life, operational efficiency, field cash flow, development costs and rate of return. As part of this strategy, the Company continually seeks to optimize its asset portfolio, which may include the divestiture of noncore assets. This allows the Company to redeploy capital into projects to develop lower-risk, long-life and low-decline properties that are better suited to its business strategy.

Since January 1, 2007, excluding three acquisitions of Appalachian Basin properties sold in July 2008, the Company has completed 33 acquisitions of working and royalty interests in oil and natural gas properties and related gathering and pipeline assets. Total acquired proved reserves were approximately 2.8 Tcfe at the date of acquisition with acquisition costs of approximately $2.26 per Mcfe. The Company finances acquisitions with a combination of funds from equity and debt offerings, bank borrowings and cash flow from operations. See Note 2 for additional details about the Company's acquisitions and divestitures.

**Efficiently Operate and Develop Acquired Properties**

The Company has centralized the operation of its acquired properties into defined operating regions to minimize operating costs and maximize production and capital efficiency. The Company maintains a large inventory of drilling and optimization projects within each region to achieve organic growth from its capital development program. The Company generally seeks to be the operator of its properties so that it can develop drilling programs and optimization projects that not only replace production, but add value through reserve and production growth and future operational synergies. The development program is focused on lower-risk, repeatable drilling opportunities to maintain and/or grow cash flow. Many of the wells are completed in multiple producing zones with commingled production and long economic lives. In addition, the Company seeks to deliver attractive financial returns by leveraging its experienced workforce and scalable infrastructure. For 2012, the Company estimates its total capital expenditures, excluding acquisitions, will be approximately $940 million, including $880 million related to its oil and natural gas capital program and $40 million related to its plant and pipeline capital. This estimate is under continuous review and is subject to ongoing adjustments. The Company expects to fund these capital expenditures primarily with cash flow from operations and bank borrowings.

**Reduce Cash Flow Volatility Through Hedging**

An important part of the Company's business strategy includes hedging a significant portion of its forecasted production to reduce exposure to fluctuations in the prices of oil and natural gas and provide long-term cash flow predictability to pay distributions, service debt and manage its business. By removing a significant portion of the price volatility associated with future production, the Company expects to mitigate, but not eliminate, the potential effects of variability in cash flow from operations due to fluctuations in commodity prices.

These commodity hedging transactions are primarily in the form of swap contracts and put options that are designed to provide a fixed price (swap contracts) or fixed price floor with the opportunity for upside (put options) that the Company will receive as compared to floating market prices. The Company has derivative contracts in place for 2011 through 2016 at average prices ranging from a low of $95.39 per Bbl to a high of $98.44 per Bbl for oil and from a low of $5.00 per MMBtu to a high of $5.84 per MMBtu for natural gas. See Note 7 for the specific years and the related commodity prices. Additionally, the Company has derivative contracts in place covering a substantial portion of its exposure to the Mid-Continent natural gas basis differential through 2015 and its timing risk exposure on Mid-Continent and Permian Basin oil sales through 2014.

29.     On April 26, 2012, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2012.  For the quarter, the Company reported a net loss of $6 million, or ($0.04) per unit, as compared to a net loss of $447 million, or ($2.75) per unit for the same period a year ago.  As to non-GAAP financial measures, the Company reported adjusted net income of $48 million, or $0.25 per unit and adjusted EBITDA of $302 million, as compared to the adjusted net income of $62 million, or $0.38 per unit and adjusted EBITDA of $210 million for the same period a year ago.

30.     On April 26, 2012, the Company filed a quarterly report for the period ended March 31, 2012 on Form 10-Q with the SEC, which was signed by Defendant Rottino, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Ellis

9

and Rockov, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

31.     On July 26, 2012, the Company issued a press release announcing its financial results for the second quarter ended June 30, 2012.  For the quarter, the Company reported net income of $237 million, or $1.19 per unit, as compared to net income of $237 million, or $1.34 per unit for the same period a year ago.  As to non-GAAP financial measures, the Company reported adjusted net income of $61 million, $0.31 per unit and adjusted EBITDA of $319 million, as compared to adjusted net income of $83 million, or $0.47 per unit and adjusted EBITDA of $264 million for the same period a year ago.

32.     On July 26, 2012, the Company filed a quarterly report for the period ended June 30, 2012 on Form 10-Q with the SEC, which was signed by Defendant Rottino, and reiterated the Company's previously announced quarterly financial results and financial position.   In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Ellis and Rockov, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

33.     On October 11, 2012, the Company announced in a press release the pricing of the initial public offering of 30,250,000 common shares of LinnCo, LLC ("LinnCo"), a wholly-subsidiary of LINN, at $36.50 per common share, which was to begin trading on the NASDAQ on October 12, 2012 under the ticker symbol "LNCO."

34.     On October 25, 2012, the Company issued a press release announcing its financial results for the third quarter ended September 30, 2012.  For the quarter, the Company reported a net loss of $430 million, or ($2.18) per unit, as compared to net income of $838 million, or $4.74 per unit, for the same period a year ago.  As to non-GAAP financial measures, the Company

reported adjusted net income of $90 million, or $0.45 per unit and adjusted EBITDA of $402 million, as compared to adjusted net income of $79 million, or $0.44 per unit and adjusted EBITDA of $243 million for the same period a year ago.

35.     On October 25, 2012, the Company filed a quarterly report for the period ended September 30, 2012 on Form 10-Q with the SEC, which was signed by Defendant Rottino, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Ellis and Rockov, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

36.     On February 21, 2013, the Company, LinnCo and Berry Petroleum Company ("Berry Petroleum") announced in a press release the signing of a definitive merger agreement pursuant to which the Company and LinnCo "will acquire all of Berry's outstanding shares for total consideration of $4.3 billion, including the assumption of debt."

37.     On February 21, 2013, the Company issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2012.  For the quarter, the Company reported a net loss of $187 million, or ($0.83) per unit, as compared a to net loss of $190 million, or ($1.09) per unit for the same period a year ago.  As to non-GAAP financial measures, the Company reported adjusted net income of $94 million, or $0.41 per unit and adjusted EBITDA of $379 million, as compared to adjusted net income of $89 million, or $0.51 per unit and adjusted EBITDA of $281 million for the same period a year ago.  For the year, the Company reported net loss of $387 million, or ($1.92) per unit, as compared to net income of $438 million, or $2.52 per unit for the same period a year ago.  As to non-GAAP financial measures, the Company reported adjusted net income of $293 million, or $1.44 per unit and

adjusted EBITDA of $1.4 billion, as compared to adjusted net income of $313 million, or $1.80 per unit and adjusted EBITDA of $998 million for the same period a year ago.

38.     On February 21, 2013, the Company filed an annual report for the period ended December 31, 2012 on Form 10-K with the SEC, which was signed by the Individual Defendants, and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-K contained signed certifications pursuant to SOX by Defendants Ellis and Rockov, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

39.     The Form 10-K represented the following in relevant part concerning the Company's business strategy:

### Grow Through Acquisition of Long-Life, High Quality Properties

The Company's acquisition program targets oil and natural gas properties that it believes will be financially accretive and offer stable, long-life, high quality production with relatively predictable decline curves, as well as lower-risk development opportunities. The Company evaluates acquisitions based on rate of return, field cash flow, operational efficiency, reserve life, development costs and decline profile. As part of this strategy, the Company continually seeks to optimize its asset portfolio, which may include the divestiture of noncore assets. This allows the Company to redeploy capital into projects to develop lower-risk, long-life and low-decline properties that are better suited to its business strategy. Since January 1, 2007, excluding three acquisitions of Appalachian Basin properties sold in July 2008, the Company has completed 40 acquisitions of working and royalty interests in oil and natural gas properties and related gathering and pipeline assets. Total acquired proved reserves at the date of acquisition were approximately 4.5 Tcfe with acquisition costs of approximately $2.01 per Mcfe. The Company finances acquisitions with a combination of funds from equity and debt offerings, bank borrowings and cash flow from operations.

### Efficiently Operate and Develop Acquired Properties

The Company has centralized the operation of its acquired properties into defined operating regions to minimize operating costs and maximize production and capital efficiency. The Company maintains a large inventory of drilling and

optimization projects within each region to achieve organic growth from its capital development program. The Company generally seeks to be the operator of its properties so that it can develop drilling programs and optimization projects that not only replace production, but add value through reserve and production growth and future operational synergies. The development program is focused on lower-risk, repeatable drilling opportunities to maintain and/or grow cash flow. Many of the wells are completed in multiple producing zones with commingled production and long economic lives. In addition, the Company seeks to deliver attractive financial returns by leveraging its experienced workforce and scalable infrastructure. For 2013, the Company estimates its total capital expenditures, excluding acquisitions, will be approximately $1.2 billion, including $1.1 billion related to its oil and natural gas capital program and $67 million related to its plant and pipeline capital. This estimate is under continuous review and is subject to ongoing adjustments. The Company expects to fund these capital expenditures primarily with cash flow from operations and bank borrowings.

**Reduce Cash Flow Volatility Through Hedging**

An important part of the Company's business strategy includes hedging a significant portion of its forecasted production to reduce exposure to fluctuations in the prices of oil and natural gas and provide long-term cash flow predictability to pay distributions, service debt and manage its business. By removing a significant portion of the price volatility associated with future production, the Company expects to mitigate, but not eliminate, the potential effects of variability in cash flow from operations due to fluctuations in commodity prices.

The Company enters into commodity hedging transactions primarily in the form of swap contracts and put options that are designed to provide a fixed price (swap contracts) or fixed price floor with the opportunity for upside (put options) that the Company will receive as compared to floating market prices.

40.    On April 25, 2013, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2013.  For the quarter, the Company reported a net loss of $222 million, or ($0.96) per unit, as compared to a net loss of $6 million, or ($0.04) per unit for the same period a year ago.  As to non-GAAP financial measures, the Company reported adjusted net income of $37 million, or $0.16 per unit and adjusted EBITDA of $356 million, as compared to adjusted net income of $48 million, or $0.25 per unit and adjusted EBITDA of $302 million for the same period a year ago.

41.     On April 25, 2013, the Company filed a quarterly report for the period ended March 31, 2013 on Form 10-Q with the SEC, which was signed by Defendant Rottino, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Ellis and Rockov, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

42.     The statements referenced in ¶¶ 20-32; 34-35; 37-41 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them, including that: (1) the Company was engaged in improper accounting practices for its hedging strategy, including the failure to properly treat certain hedging costs invested in derivatives as expenses; (2) the Company was overstating the cash flow available for distribution to unit holders by improperly using non-GAAP financial measures to account for certain derivatives including put options on natural gas; (3) the Company's energy production was not increasing, despite its heavy capital expenditures; and (4) as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

## THE TRUTH BEGINS TO EMERGE

43.     On February 16, 2013, *Barrons* published an article entitled "Drilling Into the Numbers." The article stated the following in relevant part:

> Linn (ticker: LINE) hedges all of its oil and natural-gas output with financial derivatives, the better to provide a steadily growing level of income to unit holders. The company pays an annualized distribution—the MLP equivalent of a dividend—of $2.90 per unit, which equates to a yield of 8%, based on its current share price of $36.
>
> That yield has attracted investors, but they could be overpaying. Linn's units trade for 10 times 2012 pretax cash flow, roughly double the valuation of energy

exploration and production companies such as Apache (APA), Devon Energy (DVN), and Canada's Suncor Energy (SU), and in excess of valuations accorded smaller energy producers structured as MLPs.

Moreover, Linn may be overstating the cash flow available for distribution, by not deducting the cost of financial derivatives—mainly put options—from its realized gains on hedging activities in its quarterly results. Bears argue that funds invested in derivatives should be treated as an expense, and at least one of Linn's major competitors follows that approach. Linn says its energy derivatives are an integral part of its corporate strategy and amount to an asset, much like an oil and gas property. The value of such assets typically gets depreciated over their useful life.

\*\*\*

Wall Street analysts have ignored the derivatives issue until now. Thirteen of the 18 analysts who follow the company rate it Buy, and bulls note that Linn's energy production, including oil, gas, and natural-gas liquids, more than doubled in last year's third quarter, to the equivalent of 782 million cubic feet per day.

But David Amoss, an analyst at Howard Weil, broke ranks on Friday and downgraded Linn to Sector Perform from Outperform, citing the company's treatment of its hedging costs. Amoss cut his estimate of 2013 distributable cash flow to $2.45 per unit from $3.03, "to better reflect the underlying cost of the hedges" that he estimates at $120 million annually, he wrote in a client note. Linn might have to make accretive acquisitions this year to cover its $2.90 distribution, he added. Alternately, it is possible the distribution could be cut. Linn shares fell 3.8% on Friday, but still trade for two times book value.

Linn has projected distributable cash flow of $684 million, or $3.31 a share, for 2012. It is due to report fourth-quarter results on Thursday.

Hedging gains contribute a sizable percentage of Linn's distributable cash flow. The company spent $583 million on derivatives purchases in the first nine months of 2012, and hedging gains in that period totaled $281 million, or 55% of distributable cash flow of $503 million. The company's financial reports don't break out the derivatives costs that are included in gains, but Linn's history of derivatives purchases suggests annual costs of $100 million to $150 million. Amoss' $120 million estimate is squarely in that range.

Linn expenses the cost of puts and other derivatives over a multiyear period when calculating net income, as mandated by accounting rules. But it doesn't deduct such costs from distributable cash flow, a financial measure that isn't compiled in accordance with GAAP, or generally accepted accounting principles. This means companies have leeway in making the latter calculations. Usually, they subtract interest expense and maintenance capital expenditures from gross cash flow to derive the amount of cash available to be distributed to holders.

While net income is the most common financial yardstick for corporations, it can be of little use in evaluating MLPs, particularly partnerships like Linn that make heavy use of derivatives for hedging. Quarterly changes in the value of a multiyear hedge portfolios can overwhelm and distort operating results.

Linn reported a net loss of $430 million in the third quarter, for instance. But it determined that distributable cash flow totalled $202 million. The discrepancy was caused primarily by $520 million of unrealized losses in its derivatives book, which occurred in a quarter when energy prices rose.

LINN'S DERIVATIVES PORTFOLIO has insulated the company from a weak natural-gas market, and allowed it to pay a steadily rising distribution. In the third quarter, it received a price of $2.71 per thousand cubic feet for its natural gas, but realized more than $5 per Mcf after accounting for hedging gains.

MLPs and other energy companies can use swaps or purchase put options to lock in future oil and gas prices. (Puts give the holder the right to sell a security or commodity at a fixed price by a predetermined date.) Some companies prefer swaps to puts because puts are more expensive. Most swaps are executed "at the money," meaning they are based on future oil and gas prices implied in the futures market. The advantage of a put is that the holder gets upside above the put price.

It appears from Linn's financial statements that the company bought a considerable amount of in-the-money put options on natural gas last year. These are more expensive than at-the-money puts. Specifically, Linn bought a lot of puts struck at $5 per Mcf from 2013 through 2017 at a time when the "strip" (the average price for that five-year period) was in the $4 to $4.50 range. The puts would have had an intrinsic value of 50 cents or more. Gas now trades around $3.15 per Mcf, after averaging $3 in 2012, making the puts more valuable still.

The likelihood of such gains explains why Linn spent almost $600 million on derivatives purchases in the nine months ended in September, up from just $134 million in all of 2011. Given Linn's accounting for derivatives, the put purchase prices eventually should be reflected as a hedging gain in cash flow. Linn says last year's hefty derivatives purchases reflected sizable acquisitions. It spent $2.8 billion on energy deals in 2012.

44.    On May 4, 2013, *Barrons* published a second article entitled "Twilight of a Stock-Market Darling."  The article stated the following in relevant part:

Linn Energy may be the country's most overpriced large energy producer. The controversial domestic oil-and-gas company, which is structured as a publicly traded partnership, has for years used aggressive accounting to prettify its financial statements, and serial acquisitions to shore up its reserves. Signs now suggest that those strategies, which are legal, may no longer be working.

The firm's partnership units, which trade at $38.50, may be worth less than half of their current quote, based on a range of financial measures, including book value, cash flow, and the value of energy reserves.

Linn (ticker: LINE), which has a market value of $9.1 billion and $6.2 billion in debt, has so far withstood scrutiny, in part because of its strong base of retail investors, who mistakenly liken Linn to a stable energy-pipeline master limited partnership, rather than the riskier energy producer that it is. Linn is by far the largest energy producer structured as a partnership.

Many investors look no further than the company's large and growing distribution as a sign of health. Linn yields 7.5%. In the first quarter, however, it failed to produce enough cash to cover its distribution, even by its generous measure of distributable cash flow. Should the company ever cut its payout, its units could plunge.

Houston-based Linn calls itself "a different kind of oil-and-natural-gas company." It buys oil and gas properties in the continental U.S. and hedges most of the energy output for several years to lock in revenues. Last year, it laid out $2.6 billion to acquire energy assets. Its largest deal, an all-stock, $4.3 billion purchase of Berry Petroleum (BRY), a Denver-based energy outfit, is due to close on about July 1.

Linn expects to boost its quarterly distribution to 77 cents from 72.5 cents after the Berry deal closes. Without Berry, the company projects that it would generate barely enough distributable cash flow in 2013 to cover its current annualized payout of $2.90 per unit. In this year's first quarter, Linn reported just 64 cents a unit in distributable cash flow.

In a statement, Linn said it looks at distribution coverage "on an annual basis, rather than quarter to quarter."

Linn's distributable cash flow looks significantly overstated. For starters, it doesn't reflect the cost of financial derivatives, mainly in-the-money put options on natural gas. That was the subject of a recent, skeptical *Barron's* article ("Drilling Into the Numbers," Feb. 18), when the stock traded at about $36. Since then, Linn has stated that it will stop buying puts, which allow it to sell gas for above-market prices.

*Barron's* is revisiting Linn because a bigger problem is now apparent. The company's energy production has flattened, despite heavy capital expenditures. The first-quarter financial report released on April 25 showed total energy production averaging 796 million cubic feet per day, with oil and other liquids production converted to an energy equivalent amount of natural gas. That was

down from 800 million cubic feet a day in 2012's fourth quarter and little changed from the 782 million cubic feet in last year's third quarter.

The first-quarter production was below prior Linn guidance of about 827 million cubic feet per day. It attributed the shortfall mainly to a series of one-time events, including bad weather. Linn, however, expects little change in second-quarter energy output. And the company looks for improvement in the second half of 2013.

45.     On this news, Linn units declined $1.97 per share or more than 5%, to close at

$35.75 per share on May 6, 2013.

46.     On June 4, 2013, in connection with the proposed acquisition of Berry Petroleum,

the Company filed a Form S-4/A and disclosed the following as an explanation to its mark-to-

market (gains) losses on commodity derivatives:

Represent changes in fair value of the derivative contracts from period to period and include the premiums associated with put option contracts over time. LINN considers the cost of premiums paid for put options as an investment related to its underlying oil and natural gas properties only for the purpose of calculating the non-GAAP measures of adjusted EBITDA and DCF. The premiums paid for put options that settled during the three months ended March 31, 2013 and March 31, 2012 and during the years ended December 31, 2012, 2011 and 2010 were approximately $43 million, $26 million, $148 million, $88 million and $94 million, respectively.

47.     On June 15, 2013, *Barrons* published a third article entitled "Linn Comes Clean

on Derivative Costs."  The article stated the following in relevant part:

A surprise disclosure from Linn Energy (ticker: LINE), buried in a recent regulatory filing related to its planned merger with Berry Petroleum (BRY), supports the view put forth in *Barron's* that the oil and natural-gas producer's distributable cash flow is overstated and doesn't cover its distributions to investors.

One of the key controversies surrounding Linn, which is structured like a master limited partnership, is the accounting for its energy derivatives in its distributable cash flow, a key financial measure for MLPs. Distributable cash flow (DCF) is the basis for Linn's distribution, the MLP equivalent of a dividend. Linn has a market value of $7.5 billion, plus $6 billion of debt.

Linn has realized above-market prices for its natural gas due to its use of derivatives, including in-the-money put options. This has allowed the company to get more than $5 per million British thermal units for its gas when the market price has been $4 or lower.

Linn argues that the put options amount to a capital investment, so their cost shouldn't be deducted from distributable cash flow. The company has leeway in computing DCF because the measure isn't governed by generally accepted accounting principles.

*Barron's* view is that Linn's accounting is aggressive, because the company wants to recognize the financial benefits of the puts, but not the costs ("Twilight of a Stock Market Darling," May 6). In its GAAP-compliant net income, it recognizes its derivative expense.

"It's the gain or loss from the derivative transaction that must be reflected in pre-tax accounting income, not merely the proceeds derived from the sale or disposition of the derivative," says New York tax expert Robert Willens. "I can't think of an accounting principle or theory that would permit recording only the proceeds from the derivative while ignoring the cost."

48.     On this news, Linn units plummeted $0.55 per share or nearly 2%, to close at $30.52 per share on June 17, 2013.

49.     On July 1, 2013, after the market closed, the Company disclosed that the SEC commenced an informal inquiry and it "has requested the preservation of documents and communications that are potentially relevant to, among other things, LinnCo's proposed merger with Berry Petroleum Company, and LINN and LinnCo's use of non-GAAP measures and hedging strategy."

50.     On this news, Linn units plummeted $6.24 per share or nearly 19%, to close at $27.05 per share on July 2, 2013.  The stock plummeted an additional $4.26 per share or nearly 16%, to close at $22.79 per share on July 3, 2013.

19

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

51.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Linn units during the Class Period (the "Class"); and were damaged thereby. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

52.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Linn units were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Linn or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

53.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

54.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

55.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Linn;

- whether the Individual Defendants caused Linn to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Linn units during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

56.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

57.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Linn units are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's units; and

- Plaintiff and members of the Class purchased and/or sold Linn units between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

58.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I

### (Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)

59.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

60.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

61.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of units.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Linn

22

units; and (iii) cause Plaintiff and other members of the Class to purchase Linn units and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

62.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Linn units.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Linn's finances and business prospects.

63.     By virtue of their positions at Linn, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

64.     Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Linn units from their personal portfolios.

65.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of Linn, the Individual Defendants had knowledge of the details of Linn internal affairs.

66.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Linn.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Linn's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Linn units was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Linn's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased Linn units at artificially inflated prices and relied upon the price of the units, the integrity of the market for the units and/or upon statements disseminated by defendants, and were damaged thereby.

67.     During the Class Period, Linn units were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of Linn units at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased said units, or would not have purchased them at the inflated prices that were paid.  At the time of the purchases by Plaintiff and the Class, the true

value of Linn units were substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Linn units declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

68.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

69.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's units during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

### COUNT II

**(Violations of Section 20(a) of the
Exchange Act Against The Individual Defendants)**

70.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

71.     During the Class Period, the Individual Defendants participated in the operation and management of Linn, and conducted and participated, directly and indirectly, in the conduct of Linn's business affairs.  Because of their senior positions, they knew the adverse non-public information about Linn's misstatement of income and expenses and false financial statements.

72.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Linn's financial condition and results of operations, and to correct promptly any public statements issued by Linn which had become materially false or misleading.

73.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Linn disseminated in the marketplace during the Class Period concerning Linn's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Linn to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of Linn within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Linn units.

74.     Each of the Individual Defendants, therefore, acted as a controlling person of Linn.  By reason of their senior management positions and/or being directors of Linn, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Linn to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Linn and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

75.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Linn.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

**<u>DEMAND FOR TRIAL BY JURY</u>**

Plaintiff hereby demands a trial by jury.

Dated: July 9, 2013

**ABRAHAM, WATKINS, NICHOLS, SORRELS, AGOSTO & FRIEND**

By: */s/* Sammy Ford IV

Sammy Ford IV
Federal Bar Number: 950682
Texas Bar Number: 24061331
800 Commerce Street
Houston, TX 77002
Telephone: 713-222-7211
Facsimile: 713-225-0827

**POMERANTZ GROSSMAN HUFFORD DAHLSTROM & GROSS, LLP**
Jeremy A. Lieberman
Lesley F. Portnoy
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665

**POMERANTZ GROSSMAN HUFFORD DAHLSTROM & GROSS, LLP**
Patrick V. Dahlstrom
Ten North LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184

**WOHL & FRUCHTER LLP**
J. Elazar Fruchter
Ethan Wohl
570 Lexington Avenue, 16th Floor
New York, New York 10022
Telephone: (212) 758-4000
Facsimile: (212) 758-4004
jfruchter@wohlfruchter.com
ewohl@wohlfruchter.com

*Attorneys for Plaintiff*